# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAMELA LYLES,  )
　)
　　Plaintiff,  )
　)
　v.  )　Civil Case No. 13-0862 (RJL)
　)
UNITED STATES MARSHALLS  )
SERVICE, *et al.*,  )
　)
　　Defendant.  )
　)

**MEMORANDUM OPINION**

March __ 2018 [Dkt. # 40]

This matter is before the Court on Defendants' Motion to Dismiss and for Summary Judgment [Dkt. # 40], filed on behalf of Defendants Michael Hughes and Jeremy Alford. For the reasons that follow, the Court **GRANTS** the motion.

## BACKGROUND

### I. Procedural History

Plaintiff Pamela Lyles ("plaintiff") alleges that Defendants Michael Hughes, United States Marshal for the Superior Court of the District of Columbia ("Hughes"), and Jeremy Alford, Supervisory Deputy United States Marshal for the Superior Court of the District of Columbia ("Alford"), in their individual capacities, violated rights protected by the Fourth Amendment to the United States Constitution in the course of evicting her from her former residence on April 20, 2012. This matter is before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit "for further proceedings with

1

respect to [plaintiff's] claims under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against [defendants] Hughes and Alford." *Lyles v. Hughes*, No. 15-5106 (D.C. Cir. June 24, 2016).[1] According to the D.C. Circuit, when this Court ruled on defendants' motion to dismiss, it "applied too exacting a standard" and failed to "construe the facts in the light most favorable to the [plaintiff], the nonmoving party." *Id.* Hughes and Alford move for summary judgment on plaintiff's *Bivens* claims.

Because defendants have submitted and the Court has considered four declarations, the Court treats their motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). On March 31, 2017, pursuant to *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992), I issued an Order advising plaintiff of her obligations under the Federal Rules of Civil Procedure and the Local Civil Rules of this Court to respond to defendants' motion. [Dkt. # 42]. Specifically, the Order advised plaintiff that the Court would accept as true defendants' assertions of fact unless plaintiff submitted affidavits or documentary evidence showing that defendants' assertions are untrue. Plaintiff filed her opposition on May 8, 2017. *See* Pl.'s Response to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. # 44].

## II. Execution of Writs of Restitution

---

[1] The D.C. Circuit previously affirmed this Court's disposition of plaintiff's other claims, including all of those against the U.S. Marshalls Service. *See Lyles v. Hughes*, No. 15-5106, 2015 WL 9007382 (D.C. Cir. Oct. 30, 2015) (per curiam).

2

The Superior Court of the District of Columbia ("Superior Court"), Civil Division, Landlord and Tenant Branch ("L&T Court"), issues writs of restitution (evictions). Mem. of P. & A. in Support of Defs.' Mot. to Dismiss and for Summ. J. ("Defs.' Mem."), Ex. A ("Coleman Decl.") ¶¶ 7–8 [Dkt. # 41]. Once the judge approves a writ, the writ is filed, and an L&T Court clerk delivers the writ to the United States Marshals Service, Superior Court, District of Columbia ("USMS") for execution. *Id.* ¶ 8.

A writ is valid for 75 calendar days. *Id.* ¶ 8. The USMS stamps each writ with the earliest date (four days after its issuance, excluding Sundays and holidays) and latest date (75 calendar days after its issuance) on which the writ can be executed. *Id.* ¶ 9. If a writ has been reissued by the L&T Court because it had expired, it is called an alias writ. *Id.* ¶ 10. An alias writ takes priority, and it will be executed before all other writs. *Id.* The writ for plaintiff's eviction was an alias writ. Defs.' Mem., Ex. C ("Alford Decl.") ¶ 8.

A Deputy United States Marshal ("DUSM") does not determine the appropriateness of evicting a tenant. *Id.* ¶ 9. He is assigned to a team that "merely execute[s] the order of the [L&T] Court by assuring the peaceful repossession by the landlord." *Id.*; *see also* Defs.' Mem., Ex. B ("Hunt Decl.") ¶ 10.

A Deputy in Charge ("DIC") performs administrative functions regarding evictions. Coleman Decl. ¶ 5. Among other duties, the DIC is responsible for compiling lists of evictions and scheduling evictions upon receipt of writs from the L&T Court. *Id.* Evictions are scheduled by date and by quadrant of the city. *Id.* ¶ 10. The DIC "assigns a sequential number and a time to each eviction," and "[o]nce a schedule is established, an eviction list is produced and provided to the Superior Court Dispatcher, and . . . to the L&T Court." *Id.*

3

¶ 11. However, "[d]epending upon the circumstance of any given day, evictions may be done in a different order." Alford Decl. ¶ 9.

A team of three or four DUSMs is assigned to execute the writs and to complete and return paperwork. Coleman Decl. ¶ 12; Alford Decl. ¶ 9; Hunt Decl. ¶ 6. Each team has a team leader. Coleman Decl. ¶ 12. United States Marshal Michael Hughes does not execute writs, is not a member of any eviction team, and does not supervise directly the DUSMs assigned to the writs section of the office. Coleman Decl. ¶ 12; Hunt Decl. ¶ 15; Alford Decl. ¶ 20; Defs.' Mem., Ex. D ("Hughes Decl.") ¶¶ 5–7. It is the landlord's responsibility to "hav[e] the necessary means for accomplishing evictions, i.e., ensuring entry can be made in a reasonable time, and hiring an eviction crew with the required number of workers." Alford Decl. ¶ 6. DUSMs are not responsible for moving a tenant's property. *Id.*

DUSM Coleman explains a typical eviction as follows:

> 13. Upon arrival at [a] residence, the DUSMs meet with the landlord and have him/her sign a waiver of liability on the back of the writ, and notify the dispatch. The team knocks and announces, and notifies the dweller that [it is] conducting an eviction. The deputies then enter the building (generally with weapons at the ready) to make a deliberate search of persons for items that may be of danger, clear the residence and explain the process to the occupants.
>
> 14. After the search, if the occupants are being cooperative, they are allowed a brief time to gather items such as money, jewelry, medication, keys, phones, and documents. However, there is no right to reenter the [residence], and disruptive or belligerent occupants are not allowed to return into the residence []for the safety of everyone on the scene. Occupants are then directed to exit the property and to wait outside . . . .

4

The movers are then allowed to enter the dwelling to move out the property.

15. When all appropriate property has been removed from the dwelling and placed in the public space, the DUSM[s] will turn the premises over to the landlord, and the landlord will sign the writ and acknowledge receipt of the premises. If adversarial circumstances exist, the DUSMs should remain while the landlord secures the premises to ensure that the situation does not become dangerous.

16. At the completion of the day, all writs, regardless of disposition, will be turned [in to] the Process Control Section for return to the L&T Court.

*Id.* ¶¶ 13–16.

## II. Defendants' Assertions of Fact

DUSM Coleman has reviewed USMS records pertaining to plaintiff's eviction. *See* Coleman Decl. ¶¶ 17–20. He attached to his declaration "a copy of the front and back of the Writ of Restitution executed and maintained by the USMS on April 20, 2012 for [Pamela] Lyles." *Id.* ¶ 17; *see also id.*, Attach. A. The writ bore two date stamps, April 18, 2012 and June 27, 2012, reflecting the earliest and latest dates on which it could have been executed. *Id.* ¶ 17. Handwritten notations in the upper right corner on the front of the writ indicated that plaintiff's was the eleventh eviction of the day and was scheduled to occur at approximately 3:00 p.m. *Id.* "The writ [was] directed to the United States Marshal for Superior Court, i.e., Michael Hughes." *Id.* The return bore the landlord's signature, and a handwritten notation indicated that the eviction "was 85% executed because of bedbugs." *Id.*[2] The four-man team of DUSMs consisted of Jeremy Alford, Maurice

---

[2] DUSM Coleman explains that, "[t]ypically, upon discovery of bedbugs, the eviction is halted based on health and safety concerns for the deputies and movers." Coleman Decl. ¶ 17.

5

Shanks, Frank Tyler, and Todd Hunt. *Id.* United States Marshal Hughes neither "participate[d] in executing the Writ of Restitution against [p]laintiff on April 20, 2012," nor was "present at the property that was the subject of the Writ of Restitution at any time on April 20, 2012." Hughes Decl. ¶ 7; *see also* Alford Decl. ¶¶ 8, 20; Hunt Decl. ¶¶ 6–7, 15.

According to DUSM Coleman, the USMS's radio log indicates "that the eviction team arrived at [p]laintiff's residence at 12:23[ p.m.]," the time DUSM Alford (735) called in to the dispatcher. Coleman Decl. ¶ 18; *see id.*, Attach. B. In addition, the radio log reflects that DUSM Shanks (756) called the dispatcher at 12:27 p.m. to request the assistance of the Metropolitan Police Department ("MPD") based on the landlord's request that plaintiff be barred from the premises. *Id.* A subsequent entry on the radio log indicates that DUSM Shanks called the dispatcher again at 12:31 p.m. to determine whether the eviction had been stayed. *Id.* ¶ 19. DUSM explains that, "[a]fter conferring with the L&T [Court], the [d]ispatcher reported that Tiffany Moore of the L&T Court confirmed that the eviction was 'a go' as reflected in" a radio log entry at 12:34 p.m. *Id.* Other log entries indicate that MPD did not take plaintiff into custody, that the eviction had been 85% complete due to the bedbugs, that property remained inside the residence, and that the residence had one occupant. *Id.* ¶ 20.

DUSM Alford describes the eviction as follows:

> 10. We arrived at Plaintiff's former apartment at 2435 Ainger Place, S.E., #B1, Washington, DC 20020, near 12:23 p.m. on April 20, 2012.

> 11. . . . I believe the entire team of four entered the apartment Plaintiff occupied to clear the dwelling. At some point Plaintiff was allowed to retrieve/change clothes and retrieve property .
> . . . .
>
> 12. After Plaintiff was escorted (led out of the apartment), two deputies, I believe DUSMs Shanks and Tyler, returned to finish clearing the apartment for the movers. Myself and DUSM Todd Hunt remained outside on the landing with Plaintiff, just outside the entrance to her apartment.
>
> 13. Plaintiff was arguing/yelling and struggling to reenter the apartment. She was kicking me [and] DUSM Hunt. DUSM Hunt and I tried to explain to Plaintiff that she could not reenter the apartment, but she would not listen and continued to attempt to bypass me to reenter the apartment. Initially, I merely tried to block Plaintiff's reentry, but then she had to be placed in restraints because she continued to struggle to get past us. I placed the restraints on her to protect her from injury and to reduce the need to maintain physical control by placing my hands on her. She continued to struggle, yell, and kick, and we eventually placed her on the ground and placed leg restraints on her to attempt to prevent further kicking. Plaintiff continued to try to kick once restrained. She continued to move about outside while restrained.
>
> 14. As Plaintiff was evicted, she was not allowed to reenter the apartment . . . . [T]o keep Plaintiff from reentering the apartment, hurting herself, and assaulting officers, she was restrained with handcuffs and leg restraints.
>
> 15. I used minimal force to accomplish the objective of precluding Plaintiff from further interference with our enforcement of a court order, and the use of restraints was in response to Plaintiff's disruptive conduct . . . .

Alford Decl. ¶¶ 13–15. According to DUSM Alford, neither he nor any of the other team members kicked Plaintiff or struck her in her head. *Id.* ¶ 18. He was not aware of any injuries plaintiff sustained, and had she "complained of injuries, medical attention would have been sought." *Id.* United States Marshal Hughes "was not present during the

7

execution of this writ, and to [Alford's] knowledge has never participated in the execution of a writ while the U.S. Marshal." *Id.* ¶ 20.

DUSM Hunt was a member of the four-deputy team assigned to execute the writ on plaintiff on April 20, 2012 at her former apartment at 2435 Ainger Place, S.E., #B1, Washington, DC 20020. Hunt Decl. ¶¶ 3–7. He was not the team leader. *Id.* ¶ 8. Hunt described the events as follows:

> 8. I recall first interacting with Plaintiff at the entrance to her apartment or the landing area, while . . . DUSMs Shanks and Tyler entered the apartment to clear it. Plaintiff was arguing and yelling and was kicking DUSM Alford and me as she tried to reenter the apartment. We tried to explain to Plaintiff that she could not reenter the apartment, but she continued to try to reenter. Because of Plaintiff's struggling to reenter the apartment, she was handcuffed, but she continued to kick at us and struggle. At some point, a deputy (I believe Frank Tyler) retrieved leg restraints and we placed them on Plaintiff. However, she continued struggling and trying to kick. We sat Plaintiff on the steps to try to keep her from continuing to go back in the apartment and struggle with us.
>
> 9. As Plaintiff was being evicted, she was not allowed to reenter the apartment. Also as a matter of officer safety, as well as to effectuate the Writ, tenants are not allowed to reenter the apartment once removed, particularly when they are being disruptive. Accordingly, to keep Plaintiff from reentering the apartment and from assaulting officers, she was restrained with handcuffs and leg restraints.

*Id.* ¶¶ 8–9. According to DUSM Hunt, neither he nor any of the other DUSMs kicked or struck plaintiff; they "restrained [her] to prevent her from reentering the residence, and to prevent injury to her or deputies based upon her conduct." *Id.* ¶ 12. He was not aware that plaintiff suffered any injuries. *Id.* ¶ 13. DUSM Hunt recalled that MPD officers arrived

8

on the scene, *id.* ¶ 11, and that Michael Hughes was not present at this or any other eviction in which Hunt had participated, *id.* ¶ 15.

### III. Plaintiff's Allegations of Fact

The Court previously summarized plaintiff's factual allegations as follows:

> "In the early morning of April 20, 2012, two armed U.S. Marshals and the landlord entered the Plaintiff's apartment and informed her that she was being evicted on the spot." Am. Compl. ¶ 10. Plaintiff claimed "that she had never received notice of a default judgment and informed [the Marshals] that . . . she was an attorney . . . who would never fail to respond to a notice of an eviction hearing." [*Id.*] ¶ 12. Nevertheless, defendants allegedly "move[d] toward the plaintiff in a threatening manner when the [p]laintiff demanded to see . . . evidence that she had received notice of an eviction." [*Id.*] ¶ 13. They refused plaintiff's offer to pay the amount the landlord claimed was due, [*id.*] ¶ 16, refused her request "to . . . postpone the eviction so that she could get to the courthouse to nullify the default order," *id.* ¶ 18, and refused her request for "time to arrange for someone [to] move her possessions out," *id.* ¶ 19. Further, because plaintiff "was moving too slowly," [*id.*] ¶ 22, defendants allegedly "grabbed both [of plaintiff's] arms and dragged her through the apartment and pushed her out of the door," *id.* ¶ 22. They allegedly "pushed [plaintiff] so hard that she landed on the floor [in front] of the door of the apartment across the hallway." [*Id.*] ¶ 22. When plaintiff attempted to "go back into [her] apartment to get her purse, phone, and money, [they] stopped her by handcuffing her arms behind her back," [*id.*] ¶ 23, knocked her to the floor, forced her to lie face down on the floor, and shackled her feet, *id.* ¶ 24. "Plaintiff struggled while lying on the floor, . . . cried out in pain and screamed to the witnesses" who were observing the events, and was "kicked ... on the right part of her forehead causing blood to flow" by one of the defendants after he "told her to shut up and . . . she did not." [*Id.*] ¶ 25.

9

> According to plaintiff, "[t]he Marshals carried only a few items outside and fled as soon [as] the landlord had the locks changed," [*id.*] ¶ 26, leaving "nearly all of [plaintiff's] possessions including the safe which they knew contained money and jewelry in the hands of the landlord who slammed the door shut and told the Plaintiff to get out," *id.* ¶ 27. According to plaintiff, she "was so distraught that she suffered a gran mal seizure on the spot and was rushed to the emergency room [of a hospital] by her neighbors and was subsequently hospitalized." [*Id.*] ¶ 28.

*Lyles v. U.S. Marshals Serv.*, 83 F. Supp. 3d 315, 318–20 (D.D.C. 2015), *aff'd in part and vacated in part*, No. 15-5106 (D.C. Cir. June 24, 2016) (per curiam).

## LEGAL STANDARD

The moving party is entitled to summary judgment when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "may affect the outcome of the litigation." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The movant bears the initial burden of identifying evidence that demonstrates that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A movant can satisfy that burden by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish" the "presence of a

genuine dispute." Fed. R. Civ. P. 56(c). When evaluating a summary judgment motion, the Court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted). "Indeed, the summary judgment standard requires [the Court] to credit the [non-moving party's] version of events, even if 'directly contradictory' to other testimony." *Id.* (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1867 (2014) (per curiam)). The Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

If the party moving for summary judgment meets its initial burden, then the nonmoving party—the plaintiff in this case—must identify the "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). She "may not rest upon mere allegation or denials of [her] pleading." *Anderson*, 477 U.S. at 256. If the nonmoving party fails to proffer evidence to support her assertions, then the moving party may prevail by citing that "failure of proof." *Celotex*, 477 U.S. at 323.

## DISCUSSION

### I. U.S. Marshal Hughes

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). Such an "implied cause of action is the "federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Id.* at 675–76 (citations

11

and internal quotation marks omitted). It is an action against the federal official in his individual capacity, not his official capacity. *See Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 368 (D.C. Cir. 1997). If "the *Bivens* defendant is found liable, he becomes personally responsible for satisfying the judgment[.]" *Id.* at 369. But he only can be found liable for his own actions, not the unconstitutional acts of a subordinate under a theory of *respondeat superior*. *See Iqbal*, 556 U.S. at 676; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017) ("[A] *Bivens* claim is brought against the individual official for his . . . own acts, not the acts of others."); *Tarpley v. Greene*, 684 F.2d 1, 10 (D.C. Cir. 1982) ("Respondeat superior liability was not in issue in *Bivens*, and nothing in *Bivens* suggests that respondeat superior liability must be available in actions brought directly under the Constitution.").

Hughes moves for summary judgment on the ground that plaintiff fails to demonstrate his personal involvement in the April 20, 2012 eviction from her former residence. He avers that he was not present at and did not participate in the eviction. *See* Hughes Decl. ¶ 7. DUSMs Hunt and Alford corroborate Hughes' assertion. *See* Hunt Decl. ¶ 15; Alford Decl. ¶ 20.

Plaintiff's insistence that Hughes must have participated personally in her eviction, *see* Pl.'s Response to Defs.' Mot. for Summary Judgment, at 1, 7, 10 [Dkt. # 44], appears to stem from a misreading of the writ of restitution and its return. The L&T Court issues the writ of restitution and commands the United States Marshal "to cause the [landlord] to have possession of the premises" occupied by a tenant. Coleman Decl., Ex. A (alias writ). Hughes' *title* appears on the writ in the heading which reads: "The President of the United

States *to the Marshal for said District of Columbia.*" *See id.*, Ex. A (emphasis added). There are blank lines on the reverse side of the writ in which to fill the date of its execution and the names of the deputies, acting on behalf of the U.S. Marshal, who executed the writ. What plaintiff treats as Hughes' signature appears to be Hughes' handwritten name along with the names of the DUSMs on the execution team. The fact that Hughes' name and title appear on the writ does not establish that Hughes was present during or participated in plaintiff's eviction on April 20, 2012.

It is plaintiff's burden as the non-moving party on summary judgment to proffer evidence to support her assertion of Hughes' personal involvement in the eviction. Instead, plaintiff rests on the allegations of her amended complaint and unsupported assertions that the appearance of Hughes' title and name on the writ proves that Hughes himself was present for and participated in the eviction, and the alleged constitutional violations occurring at that time. Plaintiff's claim against Hughes fails because she has not demonstrated Hughes' personal involvement in the alleged unconstitutional activity. Therefore, the Court grants summary judgment in Hughes' favor.

## II. Deputy U.S. Marshal Alford

"While carrying out their official duties, federal officials enjoy qualified immunity from damages suits in order to 'shield them from undue interference with their duties and from potentially disabling threats of liability.'" *Johnson v. District of Columbia*, 734 F.3d 1194, 1201 (D.C. Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818). Its "protection . . . applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* at 231 (citations and internal quotation marks omitted).

DUSM Alford moves for summary judgment on the ground that qualified immunity protects him from suit. *See generally* Defs.' Mem. at 12–17. The Court undertakes a two-part analysis when considering a qualified immunity defense. It must determine whether the government official violated (i) a clearly established constitutional right that (ii) was clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). The Court "may address the two stages of the qualified immunity analysis in either order." *Johnson*, 734 F.3d at 1202 (citing *Pearson*, 555 U.S. at 236).

The constitutional right at issue in this case is a person's right to be free from unreasonable seizure, and there is no dispute that this right was clearly established on April 20, 2012, the date of plaintiff's eviction. Nor is there any dispute that DUSM Alford used force to subdue and restrain plaintiff while the eviction team executed the writ of restitution. *See* Am. Compl. ¶¶ 20–25; Alford Decl. ¶¶ 13–15; Hunt Decl. ¶¶ 8–9.

Plaintiff's "claim[] that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [is] analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395 (1989) (internal quotation marks omitted). What is reasonable for purposes of the Fourth Amendment "is not capable of precise definition or

14

mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Rather, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). And the Court must take into account "the fact that [law enforcement] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. The test is an objective one. "The underlying intent or motivation of the officer is not considered; the only issue is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him." *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998) (internal citation omitted).

The Court first asks whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged "show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. Defendants demonstrate the existence of a valid writ of restitution issued by the L&T Court, and their efforts to verify that plaintiff's eviction should have proceeded as scheduled on April 20, 2012, a date well within the 75-day period the USMS could have executed it. Their supporting declarations show that plaintiff cooperated initially, and was allowed to retrieve some property and to change clothes. Only after she was escorted out of the apartment did she begin to argue with and

yell at the DUSMs. In addition, DUSMs Alford and Hunt aver that plaintiff attempted to reenter the apartment even after they told her she could not; so persistent was she that DUSM Alford could not simply block plaintiff's reentry. According to DUSM Alford, plaintiff "continued to attempt to bypass" him and DUSM Hunt, and that they placed her in restraints "to protect her from injury and to reduce the need to maintain physical control by placing [his] hands on her." Alford Decl. ¶ 13. And even after she was handcuffed, plaintiff continued to struggle, yell, and kick DUSMs Alford and Hunt, prompting the DUSMs to place her on the ground in leg restraints "to prevent further kicking," *id.*, "to keep [p]laintiff from reentering the apartment and [to keep plaintiff] from assaulting officers," Hunt Decl. ¶ 9. Yet plaintiff persisted, and continued kicking even after she had been placed in leg restraints. Alford Decl. ¶ 13; Hunt Decl. ¶ 8.

On summary judgment, it is plaintiff's obligation as the non-moving party "to provide evidence that would permit a reasonable jury to find [in her favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). She "can no longer rest on the pleadings . . . and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting [its] inquiry." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). Plaintiff fails to identify specific facts in the record showing that there is a genuine issue for trial, and instead offers only her own allegations or denials, without supporting affidavits, declarations, or other competent evidence, as is expected in opposition to a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Moseley v. King*, 197 F. Supp. 3d 210, 219 (D.D.C. 2016) (concluding that plaintiff who "offered no *evidence*—other than the mere allegation in her complaint—to refute defendant's claim that she failed to contact

16

the agency's EEO counselor on time" did not create genuine issue of material fact for trial (emphasis in original)).

Based on the record of this case, the Court concludes that DUSM Alford did not violate plaintiff's Fourth Amendment rights and, therefore, he is protected by qualified immunity. DUSM Alford is a law enforcement officer whose right to arrest a person "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. He and the eviction team arrived at plaintiff's former residence for the purpose of executing a valid writ of restitution, and notwithstanding plaintiff's cooperation early in the encounter, were faced with a yelling, arguing, kicking, and otherwise disruptive tenant. The Court concludes that DUSM Alford's use of force—physically blocking plaintiff's reentry into the apartment, handcuffing her, and placing her in leg restraints—was reasonable under the circumstances. *See, e.g., Wardlaw v. Pickett*, 1 F.3d 1297, 1303–04 (D.C. Cir. 1993); *Armbruster v. Frost*, 962 F. Supp. 2d 105, 113–14 (D.D.C. 2013).

## CONCLUSION

Plaintiff neither demonstrates that United States Marshal Michael Hughes personally was involved in the events giving rise to her Fourth Amendment claims, nor demonstrates that Deputy United States Marshal Jeremy Alford used excessive force in violation of plaintiff's Fourth Amendment rights. Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment [Dkt. # 40]. A separate order consistent with this opinion will be issued this day.

_____
RICHARD J. LEON
United States District Judge